AO 91 (Rev. 11/11) Criminal Complaint　　　　　　　　　　　　　　　　　　AUSA Maureen E. Merin (312) 353-1457

**FILED**
5/30/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

EMERIL ENGLAND

CASE NUMBER: 25CR288

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 28, 2025, at Northbrook, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 2113(a) | by force and violence, and by intimidation, took from the person and presence of a bank employee, United States currency belonging to and in the care, custody, control, management, and possession of Huntington Bank, located at 1220 Meadow Rd, Northbrook, Illinois, the deposits of which were then insured by the Federal Deposit Insurance Corporation. |

This criminal complaint is based upon these facts:

　X　Continued on the attached sheet.

/s/ Herbert E. Hogberg III (MDW with consent)
_____
HERBERT E. HOGBERG III
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: May 30, 2025

*M. David Weisman*
*Judge's signature*

City and state: Chicago, Illinois　　　　　　M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, HERBERT E. HOGBERG III, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed for almost 23 years. My current responsibilities include the investigation of violent crimes, including, among others, kidnaping, bank robbery, and the apprehension of violent fugitives.

2. This affidavit is submitted in support of a criminal complaint alleging that Emeril England has violated Title 18, United States Code, Section 2113(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging ENGLAND with bank robbery, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents who have knowledge of the events and circumstances described herein, law enforcement records, interviews of witnesses, my review of surveillance video, my training and experience, and the training and experience of other law enforcement agents.

I.     **FACTS SUPPORTING PROBABLE CAUSE**

4. In summary, on May 28, 2025, ENGLAND robbed the Huntington Bank in Northbrook, Illinois. He sprayed pepper spray, and then a fire extinguisher, at the tellers to force them to leave their posts, and then took cash from a teller drawer and fled. Northbrook Police searched ENGLAND's apartment pursuant to a warrant and found the proceeds of the robbery, the clothing ENGLAND wore during the robbery, and the can of pepper spray he used during the robbery. ENGLAND admitted to planning and committing the robbery.

5. On May 28, 2025 at approximately 9:29 a.m., Northbrook Police officers were dispatched to Huntington Bank, located at 1220 Meadow Rd, Northbrook, in response to a reported armed robbery that had just occurred.

6. According to police reports and FBI interviews, on May 28, 2025, at approximately 9:30 a.m., Victim Teller 1 observed an unknown Subject enter the bank. Victim Teller 1 described the Subject as Black male approximately 20 to 30 years old, 5'5" tall, slim build, clean shaven, with long, black in color dreadlocks, and wearing dark clothing. Victim Teller 1 greeted the Subject, who then brandished a "water gun" in his right hand and began spraying Victim Teller 1 and Victim Teller 2 with an unknown liquid substance, later determined to be pepper spray, while he carried a black in color bag in his other hand. Victim Teller 2 asked the Subject, "Dude, are you okay?", but the Subject did not provide an answer and did not speak to anyone while in the bank. The Subject then removed a fire extinguisher from the black bag and began spraying Victim Teller 1 and Victim

2

Teller 2. Victim Teller 1 ran to the nearest office, closed, and locked the door. Victim Teller 1 heard the Subject "shuffling" near the teller stations but could not see his movements. Victim Teller 1 was able to see other employees in the office across from Victim Teller 1. Victim Teller 1 had run away from the Subject because Victim Teller 1 was in fear for their life and was terrified of what might happen to Victim Teller 1 if Victim Teller 1 stayed in the lobby of the bank. Victim Teller 1 was also afraid the Subject had a gun and only exited the office once the other employees exited the office across from Victim Teller 1.

7. According to interviews of Victim Teller 2, Victim Teller 2 was working at the second teller "pod" and Victim Teller 1 was working at the first teller "pod", which are located near the main entrance of the bank. Victim Teller 2 stated that less than an hour after the bank opened, a Black male Subject entered the bank. Victim Teller 2 described the Subject as between 20-40 years old, approximately 5'3" to 5'5", small frame, with black in color dreadlocks, wearing dark glasses, black in color clothing, and a mask or scarf around his neck, with the Subject resembling rappers "Lil Jon" and "Lil Wayne," due to his small frame and dreadlocks though Victim Teller 2 noted that the dreadlocks could have been fake.

8. Victim Teller 2 explained that as soon as the Subject entered the bank, he immediately started spraying Victim Teller 2 and Victim Teller 1 with an unknown liquid, which Victim Teller 2 believed to have been pepper spray. At first, Victim Teller 2 thought the Subject may have been mentally challenged, but quickly began to fear for their safety. The Subject then started spraying a fire extinguisher

3

at Victim Teller 2 and Victim Teller 1. Victim Teller 2 ran to barricade themself in an office and feared that the Subject may have also had a gun. The Subject sprayed the fire extinguisher long enough to fill the bank with smoke. Victim Teller 2 could not see anything because of the smoke and was worried he/she was going to hear gun shots. After some time, Victim Teller 2 didn't hear anyone so he/she exited the office and triggered the alarm from their teller station. Victim Teller 2 recalled contemplating trying to fight the Subject due to his small frame, but Victim Teller 2 feared that the Subject could have a gun or another weapon in his possession. Victim Teller 2 recalled thinking that if the Subject had pepper spray and a fire extinguisher, it was possible he also had a gun.

9. Victim Teller 2 recalled that their teller drawer was unlocked and when Victim Teller 2 checked their teller drawer after the Subject had exited the bank, all of the money was taken except for two-dollar bills and coins. Victim Teller 2 advised that Victim Teller 1's teller station drawer did not appear to have been robbed.

10. Two screenshots from the bank surveillance footage, which show the offender pointing the fire extinguisher and spray towards the tellers, are below:





11. According to review of surveillance footage from a nearby business, the Subject entered the parking lot of the business from the tree line in the northwest corner which directly parallels the train tracks at 9:14:13 a.m.

12. The Subject then entered the building through the front door, carrying a black bag, and proceeded to the basement. It was later discovered that a fire

5

extinguisher was missing from that area. The Subject exited the building westbound directly after the incident at 9:26:45 a.m.. The exterior camera does not show the Subject's path of flight once he exited the building, suggesting he exited westbound and directly into the tree line.

13. According to information obtained from Huntington Bank, an audit was performed and $4,915 was lost as a result of the robbery. Huntington Bank's deposits were insured by the Federal Deposit Insurance Corporation at the time of the bank robbery.

14. While conducting an immediate canvas at the train depot located at 1401 Shermer, officers were approached by Metra staff from inbound train number 2109, which arrived at the station at 9:39 a.m. The staff reported observing a Black male, wearing clothing matching the Subject's description and with long dreadlocks (possibly a wig), as they approached the station from the north. The Subject was seen walking along the bush line near the train tracks, heading toward a silver, older model, four-door sedan in poor condition with visible exterior damage.

15. The Metra staff further stated that they observed the vehicle parked on Metra property at the southwest corner of the Dundee and Fair train crossing at approximately 9:25 a.m. hours. A photo of the vehicle captured by the train's surveillance camera, provided by Metra, is included below.



16. Officers immediately conducted a search of the area where the vehicle was observed by Metra staff. However, the vehicle had already left, and no Subject was located.

17. Below is a map indicating the area of the incident and the area the vehicle was parked:



7

18. The distance between the location of the vehicle and Huntington Bank is approximately 0.4 miles.

19. A subsequent search using license plate reader cameras in the area identified a vehicle that closely matched the description of the one seen parked on Metra property, including consistent damage to the rear bumper.



20. A search of police database records for the vehicle, a silver Toyota Avalon bearing IL reg DS 64450, revealed the registered owner to be Emeril ENGLAND at an address in Highland Park, Illinois.

21. According to license plate reader cameras, which captured movement of the Avalon at various points that morning, the Avalon left the area of 2615 W. Touhy, Chicago, at approximately 8:07 a.m., and entered Northbrook approximately 30 minutes before the robbery and was observed traveling back, in the direction of 2615 W. Touhy approximately 45 minutes after the robbery. Detectives observed the

Avalon parked in the alleyway behind the residence at approximately 11:10 a.m. hours.

22. Pursuant to a search warrant, Northbrook Police and FBI searched a unit at 2516 W. Touhy. When they executed the warrant, ENGLAND was the only occupant of the unit. Officers read ENGLAND the search warrant, during which ENGLAND stated, without prompting, that the items the officers were looking for were under the bed.

23. A search underneath the bed in the studio apartment revealed a plastic bag containing a pellet gun, a dreadlocks wig, a black hat with the words "SECURITY" in white lettering on the front of the hat and on the front left edge of the bill, similar to that worn by the robber, a can of pepper spray, a hooded sweatshirt matching the appearance of the one worn by the robber, sunglasses, and a large amount of United States currency, as well as a box of black vinyl nitrile gloves, the same color as were worn by the robber.

24. ENGLAND was arrested, and in a recorded interview, was advised of his *Miranda* rights and agreed to waive those rights and speak to FBI agents and police officers. In summary but not verbatim, during ENGLAND's interview, he admitted to planning the robbery, including by ordering the wig from an online seller approximately one week prior to the bank robbery. He stated that he brought Mace with him, but not the pellet gun, because he thought some people were not intimidated by a gun, so he had brought the Mace to use to intimidate and control the people in the bank. He chose the bank because he had previously banked at the

9

branch and was familiar with the layout. He explained that when he arrived at the bank, he went to use the restroom. While walking to the restroom, he spotted a fire extinguisher and decided to use the fire extinguisher in conjunction with the pepper spray. ENGLAND admitted to discharging the Mace, and then when he did not get the reaction he wanted, he used the fire extinguisher to get the tellers out of the bank so he could access the teller drawers. He admitted to taking the United States currency out of an unlocked drawer and fleeing the bank. ENGLAND went back to his car, which he had parked along the railroad tracks just south of Dundee Road, went back to his house, and counted the money. According to ENGLAND, he had taken $4,830 from the bank.

## II. CONCLUSION

25. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about May 28, 2025, at Northbrook, in the Northern District of Illinois, Eastern Division, EMERIL ENGLAND, by intimidation, did take from the person or presence of a bank employee, United States currency belonging to and in the care, custody, control, management, and possession of the Huntington Bank, located at 1220 Meadow Rd, Northbrook, Illinois, the deposits of which were insured by the Federal Deposit Corporation, in violation of Title 18, United States Code, Section 2113(a).

FURTHER AFFIANT SAYETH NOT.

/s/ Herbert E. Hogbert III (MDW with consent

HERBERT E. HOGBERG III
Special Agent, Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone on May 30, 2025.

*M. David Weisman*

Honorable M. DAVID WEISMAN
United States Magistrate Judge

11